Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1494 | **DATE** | September 23, 2002 |
| **CASE TITLE** | Stark v. PPM America, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiff's Motion for Summary Judgment as to Futility of Administrative Remedies, Defendants' Motion for Summary Judgment, Plaintiff's Motion for Summary Judgment, Plaintiff's Motion to Strike

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motions for summary judgment as to the futility of administrative remedies (#39-1) and Counts I, II and III (#51-1) are **DENIED**, and Defendants' motion for summary judgment (#43-1) is **GRANTED**. Furthermore, Plaintiff's motion to strike Defendants' statement of additional facts (#68-1) is **DENIED** as unnecessary. All pending dates and motions are terminated as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 26 2002 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 71 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| JHC | courtroom deputy's initials | date mailed notice | |

U.S. DISTRICT COURT
CLERK
02 SEP 25 PM 5:40

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
SEP 2 6 2002

F. JOHN STARK, III, )
)
      Plaintiff, )
) NO. 01 C 1494
v. )
) JUDGE WILLIAM J. HIBBLER
PPM AMERICA, INC., )
PPM HOLDINGS, INC., and )
the AMENDED AND RESTATED )
PPM HOLDINGS, INC. CHANGE OF )
CONTROL SEVERANCE PLAN, )
PLAN NO. 503, )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff F. John Stark, III ("Stark") filed this action against PPM America, Inc. ("PPMA"), PPM Holdings, Inc. ("PPMH"), and PPMH's Change of Control Severance Plan ("the Plan"), (collectively referred to as Defendants), seeking a declaratory judgment that he is entitled to severance benefits under the Plan (Count I), payment of said benefits (Count II), and payment of an annual bonus for the year 2000 (Count III). Pending before the Court are the parties' cross-motions for summary judgment. Stark also moves to strike portions of Defendants' additional statement of material facts, and deem certain facts in his statement admitted. For the following reasons, the Court denies Stark's motions for summary judgment on the futility of exhaustion and Counts I, II, and III, and grants Defendants' motion for summary judgment. Additionally, the Court denies as unnecessary Stark's motion to strike and admit.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of submitting affidavits or other



evidentiary material to show the absence of a genuine material issue of fact and that judgment as a matter of law should be granted in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion must then go "beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial" in order to avert summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists only where the dispute over facts might affect the outcome of the lawsuit and there is sufficient evidence to support a jury verdict for the nonmoving party. *Id.* at 250. In attempting to demonstrate the existence of disputed material factual issues that warrant a trial, the nonmoving party cannot simply rest on its pleadings, *Weicherding v. Riegel*, 160 F.3d 1139, 1142 (7th Cir. 1998), nor may that party rely upon conclusory allegations in affidavits, *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995). Furthermore, self-serving assertions, without factual support in the record, are insufficient to defeat a summary judgment motion. *James v. Sheahan*, 137 F.3d 1003, 1006 (7th Cir. 1998).

Moreover, where both parties have moved for summary judgment, the Court "considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration." *American Broadcasting Co. v. Maljack Productions, Inc.*, 34 F. Supp. 2d 665, 669 (N.D. Ill. 1998). Each movant must individually satisfy the requirements of Rule 56 in order to prevail. *Id.*

## MOTION TO STRIKE/LOCAL RULE 56.1 REQUIREMENTS

Before turning to the particulars of this case, the Court finds it necessary to address Stark's motion to strike and review the requirements imposed by our Northern District of Illinois Local Rule 56.1 which governs summary judgment motions, particularly those provisions relating to statements of material facts. In that the sole purpose of summary judgment proceedings is to identify whether there is any material dispute of fact that requires a trial, the Court must first ascertain which facts are to be considered in making this determination. Local Rule 56.1 lays out the responsibilities of each side, the movant and non-

movant, in assisting the Court with this task. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2001) ("Statements of material facts are the vehicle through which counsel identifies the relevant facts and the evidence establishing those fa[c]ts.").

Pursuant to Local Rule 56.1(a)(3), the movant is required to submit an initial statement of undisputed material facts, in the form of "short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." In other words, the movant's statement "should contain only factual allegations," not legal conclusions; "should be limited to material facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion;" and the numbered paragraphs "should contain only one or two individual allegations, thereby allowing easy response." *Malec*, 191 F.R.D. at 583. Both sides disregarded all three of these simple rules in their material fact statements. For instance, paragraph 25 of Defendants' statement is almost 3 pages long. That hardly qualifies as a *short* numbered paragraph. In addition, the parties spend an inordinate amount of time discussing Stark's work performance, which is only a peripheral issue in this case and thus not necessarily material. Furthermore, not only do the movant statements contain numerous conclusory allegations, but also the non-movant Local Rule 56.1(B)(3)(A) responsive statements are overly argumentative, which is contrary to the requirement of a "concise response" setting forth a basis for disagreement with the asserted fact.

Moreover, each factual contention must be supported by admissible *evidence*, the most common being affidavits, deposition transcripts, and business documents. *Malec*, 191 F.R.D. at 584. The *allegations* of his complaint, which Stark frequently cites to in support of his factual contentions, do not constitute evidence. Also, Stark relies extensively on his own affidavit to corroborate his statement of material undisputed facts. However, "affidavits must be made on personal knowledge," and thus the portions of his affidavit attesting to facts it is clear he could not possibly know will be disregarded. *Id.* at 584-85. *See also Byker v. Sequent Computer Sys., Inc.*, No. 96-C2297, 1997 WL 639045, at *1 (N.D. Ill. Oct. 1, 1997)

(striking paragraphs in affidavit where affiants revealed no personal knowledge for their conclusory statements). Likewise, "a hearsay statement made during a deposition does not constitute adequate evidentiary support for a factual proposition." *Id.* at 585.

Those are the standards the Court applies when identifying the relevant facts that affect its summary judgment analysis. Stark contends Defendants' statement of additional facts should be stricken because they are immaterial and wholly without evidentiary support, but his motion is unnecessary. *See McCoy v. Harrison*, No. 97-C50402, 2000 WL 713740, at *2 (N.D. Ill. May 4, 2000) (finding a motion to strike unnecessary because the court would disregard inappropriate paragraphs and objections in the 56.1 response were more than sufficient). As explained above, the Court is fully capable of parsing through the parties' factual statements and deciding which facts should be considered and which should not. *See Ogborn v. United Food and Commercial Workers, Local No. 881*, No. 98-C4623, 2000 WL 1409855, at *3 (N.D. Ill. Sept. 25, 2000) ("to the extent any factual assertion has been inadequately or improperly supported, such assertions will not be incorporated into the facts taken to be true for purposes of [summary judgment]"). Furthermore, after reviewing Defendants' responsive statement, the Court concludes Stark's complaint that certain facts have not been sufficiently controverted is unfounded. Accordingly, Stark's motion to strike is denied for the reasons stated.

## BACKGROUND

In accordance with the Court's discussion *supra*, the material facts of this case, which for the most part are undisputed, are as follows. Defendant PPMA is an investment advisor in the business of managing diverse portfolios. Defendant PPMH is the direct parent company of PPMA. PPMH also sponsors the Defendant Plan, which is an ERISA plan that provides for the payment of severance benefits to eligible participants upon satisfaction of certain conditions set forth in the Plan document.

In November 1990, Stark commenced employment with PPMA as Vice President and Counsel. Stark had responsibility for managing the workout portfolio of Jackson National Life Insurance Company

("JNL"), an affiliate of PPMA. Five years later, Stark was promoted to Executive Vice President, General Counsel and Head of PPMA's Special Investments Group. Stark then assumed greater responsibility for JNL projects and oversight of distressed securities funds, which were managed by the Special Investments Group. In January 2000, PPMA hired Lori Seegers ("Seegers") as General Counsel for PPMA, and shifted Stark to the position of General Counsel for PPMA's Special Investments. Throughout his tenure with PPMA, Stark reported directly to Russell Swanson ("Swanson"), who eventually became PPMA's president, until November 1, 2000, when Leandra Knes ("Knes") replaced Swanson as president.

On December 5, 2000, Seegers and Knes met with Stark. Knes informed Starr that he had lost the trust of everyone in the organization, and therefore was being relieved of his job responsibilities. Knes then presented Stark with a draft separation agreement which provided, among other things, that his employment with PPMA would continue until June 30, 2001, that he would be paid his base salary ($307,000/year) until then, and after his departure receive a lump sum payment of $500,000, but no bonus for 2000 or 2001. Two weeks later PPMA withdrew that offer, citing, according to Robert Saltzman, Chairman of PPMA, the discovery of previously undisclosed misconduct by Stark. On or about January 8, 2001, Stark notified Knes via letter that he believed his employment with PPMA had been constructively terminated, and consequently, he was acknowledging as such.

Shortly after the December meeting, Stark had retained the law firm of Fox & Grove to represent him in settlement negotiations with PPMA. In a letter dated January 2, 2001, Shayle P. Fox, counsel for Stark, sought payment of all sums due, specifically, a "full bonus for 2000 and the usual contributions to, and payment from, all benefit plans in which [Stark] participates." In addition, Fox asked PPMA to consider providing a severance package to Stark as it had done for all departing executives. It is not clear from the record if PPMA rejected that specific proposal. However, Stark subsequently hired attorney Vicki Abrahamson of Abrahamson, Vorachek & Mikva in January 2001 to continue negotiations with PPMA on his behalf. Abrahamson demanded 2.5 times Stark's salary in severance. PPMA's counsel

responded in a letter dated February 5, 2001, that the company had found Stark's performance unacceptable in a number of respects, and thus was only willing to entertain a proposal for a nominal settlement to bridge Stark for a short period of time while he searched for other employment. Stark retained new counsel and filed this lawsuit against PPMA, PPMH and the Plan in March 2001.

Stark claims an entitlement to severance benefits under PPMH's Change of Control Severance Plan, which was established in April 1999 and amended in July 1999, contending a clear "change of control" occurred on December 31, 1999. Prior to that time, PPMH was a wholly owned subsidiary of Prudential Portfolio Managers Ltd. ("PPML"), which in turn was a wholly owned subsidiary of Prudential plc. There was no corporate entity above Prudential plc in the ownership chain of PPMH, and therefore it was considered the ultimate parent company. According to an April 2000 filing with the SEC, in December 1999, Prudential commenced an ongoing restructuring of its worldwide subsidiaries, with the end result being the transfer of stock ownership in various subsidiaries to other direct or indirect wholly owned subsidiaries of Prudential. On December 29, 1999, PPML transferred all of its stock in PPMH up to Prudential plc, which then transferred those shares down to other pre-existing Prudential plc entities, Prudential One Limited, Prudential Two Limited, and Prudential Three Limited. On December 31, 1999, PPMH's shares were transferred to Holborn Delaware Partnership, in which Prudential One Limited (80%), Prudential Two Limited (10%), and Prudential Three Limited (10%) were partners. Finally, on March 31, 2000, PPMH's shares were transferred to Brooke Holdings, Inc., which wholly owns Holborn Delaware Partnership. Notwithstanding these changes, Prudential plc still retains direct and indirect control of PPMH, the parent company of PPMA.

Although Stark now believes the transfers in December 1999 effected a change of control as that term is defined in the Plan, he concedes that he did not comply with the administrative process set forth in the Plan for filing a claim for benefits. Instead, Stark argues his failure to exhaust must be excused due to futility, as it is certain the claim would have been denied by the Plan Committee which, at the relevant

time, consisted of the individuals who were instrumental in having him fired, Knes and Saltzman, and Jonathan Bloomer ("Bloomer"), the Chief Executive of Prudential plc. The Plan Committee has overall responsibility for the amendment, termination, administration and operation of the Plan, including determinations in connection with claims for benefits. Defendants insist there is no evidence to suggest Stark's claim would not have received full and fair review had he submitted it for consideration.

In addition, Stark claims he is entitled to a bonus for the year 2000, based on PPMA's alleged long-standing unwritten practice of paying employees at least two-thirds of their bonus potential regardless of performance, including all departing executives. Stark admits that PPMA does not have a written policy setting forth the manner in which it pays bonuses to employees. However, Stark points to the fact that for each year of his employment except 1996, 1999 and 2000, he received 100% of his bonus potential, which is equivalent to 270% of his base salary. In 1996 and 1999, Stark received only 95% of his bonus potential, but was unsure as to why Swanson, his immediate supervisor who decided how much Stark's bonus would be, did not give him the full amount. Stark therefore submits that while the amount of the bonus was discretionary, the decision whether to pay a bonus was not. PPMA, on the other hand, contends it always maintained the discretion to deny employees bonuses, and has done so in the past, where severe performance deficiencies, as it noted with Stark, existed.

Defendants now move for summary judgment, contending Stark failed to exhaust his administrative remedies under the Plan, and cannot establish either the requisite change of control that would trigger payment of benefits under the Plan, or a contractual obligation to pay a yearly bonus. Stark likewise seeks summary judgment in his favor, conceding failure to exhaust but raising futility as a defense, and arguing that the December 1999 transfer of PPMH's shares to a partnership effected a change of control, and that PPMA's past practice of consistently paying bonuses each year created an enforceable contract.

## ANALYSIS

I. *Severance Benefits Under the Plan*

Defendants argue Stark is not entitled to benefits under the Plan because (1) he failed to satisfy a condition precedent to receipt of benefits by filing a time claim to the Plan Administrator; and (2) the December 1999 internal restructuring did not involve a change of control as defined in the Plan. Stark responds that he repeatedly attempted to secure relief under the Plan, but PPMA's continued refusals to pay him severance benefits demonstrates that any appeal to administrative remedy is certain to fail. Furthermore, Stark contends, the December 31, 1999, transfer of PPMH's shares to Holborn Delaware Partnership qualifies as a change of control for Plan purposes. The Court will address each argument in turn.

### A. Futility Defense

While it is clear ERISA allows plan participants who believe they have been wrongfully denied benefits under an employee welfare benefit plan to file a civil action seeking redress, *see* 29 U.S.C. § 1132(a)(1)(B), the statute is "silent as to whether exhaustion of administrative remedies is a prerequisite to bringing such a civil action," *Kross v. Western Elec. Co., Inc.*, 701 F.2d 1238, 1244 (7th Cir. 1983). The Seventh Circuit has held that the decision to require exhaustion or not is "a matter within the discretion of the trial court." *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996). Stark concedes he did not file a claim for severance benefits in accordance with paragraphs 14 and 15 of Appendix B of the Plan, but argues that the futility exception applies here and thus excuses his failure to exhaust internal plan remedies. To persuade this Court to invoke the futility exception, Stark "must show that it is certain that [his] claim will be denied on appeal, not merely that [he] doubt[s] an appeal will result in a different decision." *Smith v. Blue Cross & Blue Shield United of Wisconsin*, 959 F.2d 655, 659 (7th Cir. 1992).

Stark offers three reasons in support of his contention that an appeal would be futile. First, he argues that his attorneys continually raised the issue of severance benefits under the Plan over the three

months of extensive settlement negotiations with PPMA, but each time his request was rejected. However, the Court finds it quite a stretch for Stark to maintain that his attorneys specifically requested benefits under PPMH's Change of Control Severance Plan between December1999 and March 2001. Stark points to the January 2, 2001, demand letter from Fox & Grove as proof, but that does not help his cause since counsel only generally sought "payment from all benefit plans in which [Stark] participates," and the severance package PPMA had uniformly provided to all departing executives. Nor does the demand by Stark's second attorney Vicki Abrahamson for 2.5 times his salary in severance, the exact amount set forth by formula in the Plan, bolster his claim. At her deposition, Abrahamson testified that her primary basis for requesting that particular amount was because she believed PPMA had been applying the Plan formula in severance packages for its high-level employees, regardless of whether there had been a change of control. (*See* Vicki Abrahamson Dep. Tr. at p.14).

The Plan requires individuals seeking benefits to submit an application on either a form provided or approved by the Plan Administrator, or "on any form that specifies, in reasonable detail, facts and circumstances and the applicable Plan provisions which the Participant believes entitle him to compensation and benefits under this Plan." (The Plan, Appendix B at ¶14). Stark has not identified evidence in the record showing his attorneys in fact submitted to the Plan Administrator or the Plan Committee a detailed request for benefits due to a change of control involving PPMH. As such, Stark cannot now contend that merely because PPMA refused to give him severance pay after his termination it is certain his claim for severance benefits arising under the change of control severance Plan would have also been denied. *Cf. Lindemann*, 70 F.3d at 650 (plaintiff's claim for separation benefits that had been denied by employer was not so identical to her ERISA claim that it was clear the latter would likewise be rejected).[1]

---

[1] Stark also claims he was unable to articulate a specific theory as to how the stock transactions occurring in December 1999 triggered the change of control provisions in the Plan until some six

Next, Stark argues an obvious conflict of interest existed that would have prevented the Plan Committee consisting of Saltzman, PPMA's Chairman, Knes, PPMA's President and Bloomer, Prudential's CEO, from fairly considering his claim for severance benefits, since Knes made the decision to terminate Stark and told Saltzman that Stark was "evil." Futility cannot be inferred, though, simply because one of the individuals responsible for Stark's termination is a member of the group designated by the Plan to review administrative appeals. *See Ames v. American Nat'l Can Co.*, 170 F.3d 751, 756 (7th Cir. 1999) (citing cases). While the record certainly reflects that Knes and Saltzman did not think very highly of Stark's performance at PPMA, there is no evidence to suggest they were biased against Stark and consequently unable to impartially decide if there had been a change of control that would entitle him to receive severance benefits. Stark's reliance on *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 405 (7th Cir. 1996), a case in which the Seventh Circuit found an allegation of hostility between the parties sufficient to bring a claim within the futility exception, is misplaced. The issue there was whether plaintiff had sufficiently *alleged* futility in order to survive a motion to dismiss. Here, in contrast, because Stark seeks to prevail on summary judgment, he must present evidence to prove his theory that the Plan Committee was so conflicted it would have been futile for him to file a claim. This he has not done.

Finally, Stark contends the personal opinions of Knes and Saltzman expressed throughout this litigation that no change of control occurred in December 1999, is the most dramatic proof that further administrative review would be futile. However, the Court does not believe their doubts as to the validity of Stark's benefits claim necessarily means the internal Plan remedies would have failed. As the Seventh

---

months into this litigation because the relevant information and documents were in Defendants' possession. However, the Court finds that argument disingenuous. As a PPMA executive, Stark was well aware of and very much involved in the Prudential restructuring process that occurred in late 1999 and early 2000. Indeed, Stark knew long before his December 2000 termination and subsequent settlement discussions that PPMH's shares had been transferred to a partnership prior to the final transfer to Brooke Holdings, a corporation. Thus Defendants bear no responsibility for Stark's failure to explain until now a specific basis for arguing that a change of control as defined by the Plan had occurred.

Circuit so aptly noted, "it would be bizarre indeed to find that [Defendants'] price for prevailing on the exhaustion argument is that it is estopped from urging the interpretation of the plan that it believes is correct." *Ames*, 170 F.3d at 756.

The Court therefore concludes Stark has not met his burden of demonstrating that he is entitled to judgment as a matter of law on the futility issue. Moreover, Stark's attempt to invoke in his reply brief in support of his motion for summary judgment the second exception to the exhaustion requirement, lack of meaningful access to the review procedures, *see Smith*, 959 F.2d at 659, must be rejected for two reasons. First, Stark cannot raise new arguments or legal theories in his reply brief. *See Ty, Inc. v. The Jones Group, Inc.*, No. 99-C2057, 2001 WL 1414232, at *2 (N.D. Ill. Nov. 9, 2001). And second, Stark's contention that the Plan Administrator somehow hindered his ability to file a claim by failing to provide him with the appropriate form is illogical, since the Plan also allowed participants to submit a written claim without such a form. Stark's motion for summary judgment on futility is denied.

## B. Change of Control under the Plan

But even if Stark had been excused from complying with the Plan's administrative process, his claim for severance benefits would nonetheless fail because it is clear that, contrary to Stark's contentions, no change of control as defined by the Plan occurred in December 1999. Whether there has been a change of control under the Plan is a matter of contract interpretation, "a subject particularly suited to disposition by summary judgment." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998). The written instrument that must be considered is the Plan itself, which the Court construes "in accordance with the federal common law under ERISA and general rules of contract interpretation." *Id.* The express terms of the Plan are interpreted "in an ordinary and popular sense as would a person of average intelligence and experience." *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 633 (7th Cir. 2001) (citation omitted). Furthermore, "if the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible." *Grun*, 163 F.3d at 420.

-11-

The Plan lists eight specific events (in addition to a general catchall provision), constituting a change of control that triggers eligibility for severance benefits. Stark contends the December 1999 transfer of PPMH's shares to Holborn Delaware Partnership satisfies the following subsections in the Plan:

(vii) the sale or other disposition by the Ultimate Parent of more than 50% of the stock or assets of an Employer;

(ix) any other transaction which the Committee shall determine, in its sole discretion, has the effect of a Change of Control with respect to any individual so designated by the Committee.

Concerning the terms used in subsection vii, the Plan defines an "Employer" as including PPMH. Furthermore, "Ultimate Parent" means "the uppermost parent corporation which directly or indirectly owns PPM Holdings through a chain of ownership where each parent corporation owns at least 50% of the Voting Power of the immediately lower tier subsidiary." The Plan also contains a caveat in that "the occurrence of an event described in clause (vii) or (ix) shall not constitute a Change of Control hereunder if the Ultimate Parent retains direct or indirect control of the business."

It is undisputed that prior to the December 1999 restructuring, Prudential plc was considered the Ultimate Parent of PPMH, and that post-transfer, Prudential plc retained direct and indirect control of PPMH. Additionally, the parties agree that the transfer of PPMH's shares down from Prudential plc falls squarely within the subsection vii description. Where the parties diverge is on who is now the Ultimate Parent of PPMH, with Stark contending it is Brooke Holdings, Inc., and Defendants insisting it is still Prudential plc.

In support of his position, Stark focuses on the word "corporation" in the "Ultimate Parent" definition, and argues that once PPMH's shares were transferred to Holborn Delaware *Partnership*, the chain of ownership by *corporations* was severed. After that happened, Stark contends, Prudential plc ceased to be the Ultimate Parent because it no longer owned at least 50% of the corporation immediately below it. Instead, Stark maintains, Brooke Holdings, Inc., to whom PPMH's shares were transferred

from Holborn Delaware Partnership in March 2000, stepped into the role of Ultimate Parent, as it became the uppermost *corporation* owning PPMH. The Court does not buy that argument, though. Indeed, Stark's assumption that the relevant term in the Ultimate Parent definition is "corporation" is fallacious since the Plan language evinces a clear intent to bestow that title upon the uppermost *parent corporation* in the Prudential ownership structure. Parent corporation, according to Black's Law Dictionary, is used interchangeably with parent company, and either term refers to a "[c]ompany owning more than 50 percent of the voting shares, or otherwise a controlling interest, of another company, called the subsidiary." BLACK'S LAW DICTIONARY 1114 (6th ed. 1990). As such, a parent corporation is not limited to corporations only, but can also include any company that owns at least 50% of the lower tiered subsidiary. Although it is not necessary to consult extrinsic evidence because the Plan language is unambiguous on this point, the Court notes that the Summary Plan Description states "'ultimate parent' means the uppermost parent <u>company</u> that owns PPM Holdings" (emphasis supplied). (*See* Pls. Statement of Uncontested Material Facts Pursuant to Local Rule 56.1, Ex. J, Summary Plan Description at p.8). Consequently, the December 31, 1999, transfer of PPMH's shares to a partnership did not alter Prudential plc's status as the Ultimate Parent. In light of Stark's concession that Prudential plc has not relinquished control of PPMH, pursuant to the exception in the Plan language, no change of control was effected under subsection vii or ix.[2] Therefore, Stark's claim for severance benefits under the Plan cannot be sustained. Summary judgment is granted in favor of Defendants on Counts I and II of the complaint.

*II. Bonus Compensation*

Defendants contend Stark cannot establish a definite and certain agreement to pay him a yearly

---

[2]Stark argues at length that the December 1999 restructuring led to new management of PPMA, since Saltzman, JNL's CEO, took over as Chairman at PPMA, and changed the philosophy and goals of the company. Even if that characterization is true, for purposes of the Change of Control Plan the Court is concerned only with whether the Ultimate Parent retained direct or indirect control of PPMH. Thus the fact that Saltzman may have sought greater control of PPMA's operations is irrelevant to the change of control analysis.

bonus and thus his breach of contract claim fails. Stark responds that all employees of PPMA are entitled to receive a yearly bonus, particularly high-ranking executives. In support of his argument, Stark relies on language in the Plan requiring that upon a change of control, Plan participants must be paid an accrued bonus. However, that requirement does not apply here because, as the Court has already explained, no change of control occurred to trigger a right to payments under the Plan. Next, Stark cites provisions in the Illinois Wage Payment and Collection Act ("IWCA"), 820 ILCS 115/1 *et seq.* defining final compensation that must be paid by an employer to a departing employee as including earned bonuses. But because Stark did not claim violations of the IWCA in his complaint, he cannot now raise the matter for the first time on summary judgment. *See e.g., Cebertowicz v. Motorola, Inc.*, 178 F. Supp. 2d 949, 953 (N.D. Ill. 2001). Furthermore, the IWCA mandates the payment of compensation owed pursuant to a contract or agreement between the parties. *See* 820 ILCS 115/2. Thus, "the [IWCA] does not confer any rights to recovery of final compensation in the absence of a contractual right." *Tatom v. Ameritech Corp.*, No. 99-C683, 2000 WL 1648931, at *9 (N.D. Ill. Sept. 28, 2000) (citation omitted).

The only evidence Stark presents as proof of a binding contractual obligation by PPMA to pay bonuses is the fact that for each year of his employment except 2000, he received a bonus amounting to 95-100% of his bonus potential, and nearly two-thirds of his total income was derived from the bonus. But Stark cannot rely solely on PPMA's past practice of paying bonuses to create an obligation under the principles of contract law. *See Brines v. XTRA Corp.*, No. 01-3977, 2002 WL 31012242, at *3 (7th Cir. Sept. 10, 2002). In fact, as the Seventh Circuit recently concluded, "[t]he normal understanding of severance pay (when not provided for in a written plan), as of bonuses, is that it is at the discretion of the employer; there is nothing here to upset that understanding." *Id.* at *4. *Camillo v. Wal-mart Stores, Inc.*, 582 N.E.2d 729 (Ill. App. Ct. 5th Dist. 1991), a case Stark relies upon, is inapplicable because the plaintiff's right to a bonus was established, and thus the only question before that court was how much he should receive.

Defendants note there were two individuals like Stark who were terminated by PPMA in 2000 and did not receive a bonus. Stark counters those were lower-level employees, and points to two executives terminated in 2000 who did receive a bonus as part of their settlement agreements. That two management employees were able to negotiate bonus payments in connection with their termination does not mean, though, as Stark argues, that PPMA was obligated to pay a bonus to every departing executive. Moreover, while the fact that Stark's bonus potential was set at 270% of his base salary certainly suggests bonuses were intended to be an integral part of compensation, the Court agrees with Defendants that the use of the word "potential" means Stark was not guaranteed a bonus.[3] *See Cresswell v. Bausch & Lomb, Inc.*, No. 85-C5822, 1986 WL 13528, at *5 (N.D. Ill. Nov. 21, 1986). Because Stark has not produced any evidence that PPMA created an enforceable contract right to a bonus, Defendants are granted summary judgment on Count III of the complaint.

## CONCLUSION

Stark's motions for summary judgment are denied, while Defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

_____
WILLIAM J. HIBBLER, DISTRICT JUDGE

DATED: September 23, 2002

---

[3] Additionally, the offer of employment by PPMA to an executive that Stark attaches as Ex. 54 to Volume Two of his appendix of exhibits supporting his material factual statement, references a bonus "opportunity" of up to 150% of base, with a target of 2/3 payout. Such an indefinite statement clearly placed the awarding of a bonus at PPMA's discretion. *See Grottkau v. Sky Climber, Inc.*, No. 93-C6277, 1995 WL 32611, at *21 (N.D. Ill. Jan. 26, 1995).